which is Pierre versus Midland Credit. All right, I think we have everyone. Mr. Brody, you may proceed. Thank you, Chief Judge Sykes. This dispute does not belong here. The plaintiff lacks Article 3 standing to sue and the district court erred in denying the Rule 12b1 motion. The legal principles governing the standing question are well-established and were recently expressed by this court in the Casillas case. To have standing, a plaintiff must have a concrete and particularized harm. That harm must be fairly traceable to the alleged violation, and the violation has to be something the court can remedy. As is critical here, the case turns on those first two issues, concrete harm and traceability. In Casillas, the plaintiff alleged the debt collection letter incorrectly stated what she needed to do to contest a debt, but she had no intention of contesting the debt, and this court found as a consequence there was no standing. Those same principles applied in this case to Ms. Pierre's standing. The plaintiff did nothing that amounts to a concrete harm, but if she did anything or felt an emotion that this court would that reaction had nothing to do with the violation that gives rise to liability, it was not tied to the allegedly actionable disclosure. The plaintiff alleges no out-of-pocket loss. She does not seek actual damages. She seeks statutory damages, as is her right. But what is it that the plaintiff alleges gives rise to standing here? Well, one thing that she did is that she called Midland, and she testified that she called Midland to tell Midland not to any more letters or call her, and Midland complied with that request. The Supreme Court in Clapper has said that a party cannot manufacture standing by inflicting a harm upon itself. A self-inflicted harm does not give rise to standing. Otherwise, a party would have standing simply by doing those sorts of things or by hiring a lawyer, which is one of the other things that the plaintiff alleged. Mr. Brody, that call was in response to the letter, right? You all invited the calls. Correct. The letter was. And we've said in a number of these consumer protection cases, in essence, and the standard as I understand it is whether the plaintiff was at risk of suffering the kinds of harm that the act was intended to prevent. I would think that calling Midland on a recorded line where somebody would be vulnerable to saying, well, maybe I'll try, could say things that could wind up, I'll try to make a payment that could be interpreted as undermining the statute of limitations defense would kind of be pretty close to the heartland of standing in this sort of case. Well, I'm not sure, Your Honor, if that would be standing in a different case, but it wouldn't be standing here because that's not the call she made. She didn't call to express a risk of payment. She called to say, I don't know you anything and don't send me any more letters. And she did that after she had been, as I understand her testimony, upset, uncertain, particularly in light of the earlier litigation between the parties, and that that kind of anxiety and uncertainty is part of what the act is intended to protect people from. Well, that's the next thing I'm getting to, and I think that's an important point, Judge, which is whether her subjective fear or anxiety here gives rise to standing. The prior lawsuit was in 2010. The letter was sent five years later, and the letter said, we will not sue you, and we will not report you to a credit agency. She testified in her deposition. You're also saying the payment is due on any of three different dates, and I didn't see any don't pay us option on the letter, right? No, but that's not selection practices that requires, Your Honor, and I think we're... No, it requires that the and her reaction to this to the point, pretty unusual evidence that she was actually doing her own legal research and consult your letter. I don't know. It seems to me like a pretty good argument for standing. Well, I guess I take issue with that on this fear point, Your Honor. She testified that she feared that she might be sued again, and she feared that Midland would report her to a credit agency, but the letter that she received said exactly the opposite. It said, we will not sue you, and we will not report you. Mr. Brody, what about that point that may go to traceability? It may go to the point you just made with regard to someone else suing her rather than Midland. Well, the debt here wasn't somebody else's to collect. The debt was held by a Midland affiliate and Midland Credit Management, the defendant in this case, was the debt collector. There's a suggestion, the plaintiff argues, that perhaps Midland could transfer the debt or perhaps Midland could change its policies. There's no, frankly, there's no evidence to support that, nor is the fear of future speculative harm sufficient to give rise to a present cause of action. The possibility that Midland might do something in the future that might, if those things came to pass, lead to a future harm doesn't constitute a present violation of the statute, nor give her a present injury. If Midland, after saying, we will not sue you, sued her, she would have a claim. But after sending her a letter that says, we will not sue you, the suggestion that she feared suit, and that gives rise to standing, flies counter to the Clapper case, for example, where the Supreme Court said that the fear to be actionable has to be certainly impending. Brody, can I ask you, in these zombie debt cases, where the statute of limitations has long expired, what the debt collection industry always argues is that we're entitled to at least try to, for example, we're not allowed to give an impression, the industry usually concedes that this is a legally enforceable obligation, but we can't sue, we can't threaten to sue, but we're entitled to appeal to a sense of moral obligation. Right? That's been found to be lawful, Your Honor, yes. Right. Where do we see that in Midland's letter to Ms. Pierre? What I see is pre-approved for a discount, a discount from what certainly implies to be a present obligation. Well, Your Honor, it uses the same press the Pearson case, and earlier than that in the Every case, found fit within the safe harbor. The language in the letter, and it's at the bottom of the disclosure where it says, we're not obligated to renew this offer, has been interpreted. That's a whole different problem, and as you may or may not have noticed, I agreed completely with the defendants in the Every settlement issue problems, but I don't see, but to go back to this role, this question about zombie debt, I just don't see the moral obligation being invoked. Instead, what I see is a lot of smoke and mirrors intended to give the impression that this person really ought to pay on this time-barred debt. Well, Your Honor, I'm unaware of any case that has held that Midland has to limit its appeal to a moral obligation. I think that... No, that's not my point. My point is that this letter seems to have stirred exactly the kind of responses in Ms. Pierre that are predictable and that the act intends to protect against, at least a risk of those, but I don't want to argue with you. I want to find out more information. Well, I'm not sure what more I can say, Your Honor. I know the letter follows, I think we're kind of segueing now into liability issues. If I can put a pin in that and just finish up a little on standing, and I think this was the point perhaps that Judge Brennan asked about the Ms. Pierre's deposition, made clear that the things in the letter that she was reacting to weren't the things that are the subject of liability here. She explained that she called Midland because she didn't want them to call her again. She was quite certain that she didn't owe any money and had no intention to pay. She did not complain about a possibility of reviving the debt. She did not complain about the possibility of Midland suing her, even though they said they will not sue her. So the things she complains about don't trace to the letter. So to sum up on the standing issue, the subjective fear she identifies doesn't satisfy the standard of clapper, nor is it traceable. And in circumstances just like this, we submit the Casillas case, but more recently, the Frank case in the D.C. Circuit and the Trickle and Cooper cases in the 11th Circuit, and even the Fole case, the Supreme Court's case, all point in the direction of standing being improper here. But let me just close the loop on this idea of the policies. The policies were not made part of the district court record, were they? There was testimony, not written policies, to my knowledge. There was testimony from 30B6 witnesses and from a witness at trial that that was the policy. And frankly, Judge, it's been five years and none of this debt has been sold, transferred, sued on, reported to a credit agency, revived. None of the things that are if indeed they were risks, and we submit they weren't, were certainly not, certainly impending. But on the question of policies, I assume those would be changeable tomorrow, right? Obviously, that's possible, Your Honor. The policies that we're talking about are central to Midland, and they've been in force for a very long time. So I think as a practical matter, that's not the case. Moreover, this is an obligation of the plaintiffs to prove, and that hasn't been established. Plaintiff has to show standing. It's an obligation to create jurisdiction in this court. Turning to the merits, because I failed to do that earlier and said I would. The Fair Debt Collection Practices Act doesn't prohibit debt collectors from attempting to collect time bar debt. And the regulators and state regulators, federal and state regulators, have through statutory provisions and consent orders, approved exactly the language that Midland used here. The court found that that language was misleading as a matter of law, which we submit was an error. Following statutory command and regulatory direction and using language approved, exact language approved by other courts, is not deceptive as a matter of law, which is the procedural posture in which we are here. Mr. Brody, you mentioned other courts, and I want to direct your attention to the Stimson case. Yes, Your Honor. Circuit. As far as the revival language, do you argue that this case is distinguishable from Pantoja? Well, we think it's distinguishable from Pantoja. We don't think that our argument requires this court to reverse Pantoja. And we recognize the court may disagree with that. And if the court disagrees, then we invite you to, pursuant to Rule 40E, follow the Stimson case. But to the point of partial payment disclosure, we read the Pantoja decision as it said that the defendant in that case omitted a specific disclosure and did so in a way that was careful and deliberately deceptive. The language that Midland used, however, used the entire disclosure, which made reference to the statute of limitations, the statute of limitations limiting the time period to collect on a debt, immediately following that with the language that said Midland will not sue, all of which were true. We submit that that complies with the Fair Debt Collection Practices Act. The statute— Does that comply with the branch of Pantoja dealing with the revival of the statute of limitations issue? Your Honor, you know what Pantoja says. I'm not going to try to disabuse you of its meaning. We think the language in that decision that distinguishes the disclosure from disclosures that had previously been approved is important. That's the second. Pantoja had two independent holdings, as I'm sure you recall. And I understand your argument on the different language to apply to the second. But I don't see, at least I have trouble seeing how this is any different from Pantoja with respect to the silence on the risk of reviving the statute of limitations clock, starting it over again, by the partial payment or promise of payment issue. Okay. Well, there are two distinctions. First, the Midland disclosure had the first language, first section of the disclaimer, which said that the statute of limitations was applicable, does affect the time period that someone can sue, and followed that with the language that said Midland will not follow, will not sue. And second, there was testimony in this case, and I don't know deep in the record in Pantoja if this was there, but it wasn't in the decision. There's testimony in this case that Midland backed up that announcement that it will not sue with its established policies, that under no circumstances would it sue, nor under any circumstances would it move to revive the debt. We think those disclosures make a difference. And Mr. Brody, if I could ask, you all have argued in essence that the revival issue cannot be addressed practically without confusing and misleading people. I think you suggested you'd need the equivalent of the restatement of contracts in the letter. I assume from some of the argument in the briefing that you all have been sending letters that you think are compliant with Pantoja, at least in the Seventh Circuit after that decision came out, correct? That's correct. After the decision came out, we've adjusted our practices in response. Yes, Your Honor. So you think there are letters that are not deceptive or misleading? Your Honor, I think there remains a risk that Midland will be sued for that letter as well. We have those letters in our record here. You know, I don't know, Your Honor, if they were attached to the motion in limine that was filed on the subsequent remedial measures issue. That's where I would look, but I don't remember if the specific language is there. Okay. Thank you. But to the point, the statute doesn't require Midland to submit a letter that is, in all statute, is not misleading. The precise language that Midland used in this letter has been found by the Ninth Circuit to be misleading, excuse me, to not be misleading. And the court did so relying on the distinctions we point out. The fact that there was the specific disclosure of the statute of limitations followed by the will not language, the court read those in conjunction and found those to be significant. We submit that distinguishes this case from Pantoja. If the court disagrees, we believe Stimson is better reasoned, with all due respect, Your Honors. What's the market value of this debt? Of whose debt, Ms. Pierce? The statute of limitations barred debt, also known as zombie debt. I don't know, Your Honor. I know it trades at a discount, but I can't tell you how much. A couple of years ago, John Oliver did an experiment where he bought it at less than a half penny per dollar. Does that sound about right? I have no reason to agree to that or not, Your Honor. I don't know. Okay, thanks. I'll save the rest of my time for rebuttal, if that's permissible. Thank you. Thank you. Mr. Markoff. May it please the court. Your Honors, Midland Credit seeks to throw out a jury verdict, ignoring this court's clear precedent in Pantoja, which, as you know, held that the Dunning letter on time-barred debt that fails to warn of a potential revival of the statute of limitations is a violation as a matter of law of the FDCPA. It doesn't offer anything to overcome Pantoja, and in particular on the revival issue, this case is identical to Pantoja. The so-called additional disclosure does nothing, as Judge Hamilton noted, to overcome that. Mr. Markoff, you will have to address standing. Yes, sure. I wanted to lay out sort of a framework. The, on standing, the primary argument seems to be that Ms. Pierre did not pay anything, and I want to get to the primary jurisdiction on that count one in a moment, but Ms. Pierre also has ancillary jurisdiction. Yeah, that does not help you. Okay. Jurisdiction is count by count, standing is count by count. You've got to get, whatever you do on count one is standalone. Okay. Nonetheless, on count two, the factor here is whether Ms. Pierre had an actual or imminent concrete and particularized injury, and this court has repeatedly, including this summer in Bryant versus Compass Group. Actually, we're focusing on her standing on count one. Count two, as I understand it, has to do with some... No, I'm sorry. You're right, Judge. I meant to say if count two, even if count two didn't exist. Okay. This court this summer in Bryant held that withholding or misrepresenting substantive information constitutes a concrete and particularized injury, and in fact, held that the mere risk of real harm can suffice. The concrete harm here, as recognized in Pantoja, is the loss of an ironclad defense by partial payment, upon which the district court made its summary judgment ruling here. And didn't dismiss for lack of standing. The risk of harm comes in the form of the demand for partial payment. And to be clear, Midland didn't merely appeal to the debtor's better angels, or make a moral appeal for judgment. It could have laid out all of this stuff and said, hey, but you have a moral obligation to pay, and it didn't choose to do that. Instead, it repeatedly told them that they had a payment due date. But if the consumer paid, she would instantly lose that ironclad defense by operation of law, and that was the risk created solely by these letters. Unlike a procedural violation, such as failing to advise a debtor that a debt dispute must be in writing, as in Casillas, a debtor who receives a misleading or deceptive communication, attempting to lure her away from an ironclad defense, is concrete and particularized, regardless of whether she suffers actual damages. But your client said she was not misled. Well, you need a concrete injury, in fact, that's particular to her. Right. She said there was nothing confusing about this to her. She understood completely. She was not, in fact, misled. She would not have done anything differently, but for the content of the letter that's being challenged here. And so I'm struggling to find a concrete injury in fact here. Well, two things. When she said she understood, it was in a deposition when she was handed the Dunning letter, told to read it, and she said she understood completely. So yes, she can read, as the district court noted. That's what she was doing. She can read, she read it, and she understood it as she sat there. The risk still remained, regardless that if a partial payment was made, or potentially even promised, that the defense would go away. She did have concerns. She would not have done anything different. She understood she didn't have to pay the debt. She was not going to pay the debt. She understood she wasn't going to be sued on the debt. And she would not have done anything differently. Well, she was wrong, but she didn't. But for the language of the letter that's being challenged in this suit. So you have to trace the challenged, alleged misrepresentation to a concrete harm that she suffered. And when she says affirmatively that she was not misled, she was not confused, she understood, and she would not have done anything different. And in fact, did not do anything differently. Again, I struggle to see a concrete injury in fact, that's not just purely psychic, which is insufficient under Clapper and other cases. Well, I guess I just disagree with Your Honor's characterization of her testimony, and that she certainly did have concerns and was in a dilemma. Now, she ultimately did not pay, that's true. She talked to me. She also said she was not going to, she had no intention of, and she didn't alter her conduct in any way because of the content of the letter that you're challenging now. And that forms the basis of this claim under the FDCPA's 1692 E and F. So it's, you've got to connect the two. And when the named plaintiff says, I wasn't misled. I wasn't confused. I didn't do anything different. Nor was there any risk that I was going to do anything different. It seems to me you got to find another plaintiff, because this one doesn't have any standing. Okay, well, I don't think that was her testimony. I think she did alter her. She did react to the letter. She took multiple actions in response to the letter. But not the particular language that's being challenged. There was nothing about that language that caused her to behave differently, as I understand her testimony. Well, she did express concern about having to pay by the due date. Which if she didn't, she was concerned about being sued again. And had she done that. You're not challenging the due date. You're challenging the content of the letter to the extent that it deals with the time-barred nature of this debt. This language that was negotiated in the consent decree that appears in all of Midland's letters for this particular time period. That's the focus of the claim, as I understand it. Not the fact that there was a letter sent that had information about a discounted payment schedule that she could take advantage of. And a deadline to do that. That's not the substance of your claim. I thought the claim had more to do with language that simply was not present at all. Dealing with the Pantoja revival holding. And at least I read here's deposition testimony to indicate a fair amount of uncertainty and anxiety about how all these different pieces of the letter fit together. Particularly with the history of litigation between her and Midland. Is that right, Mr. Markoff? Yes, exactly. In fact, literally when she called me, she said they're coming after me again. So there were a number of facets of it. And she did testify that she... Let me say this. The claim does, in fact, involve all of those things you mentioned, Chief Judge Sykes. The district court chose only to rule on one of them. And that risk of real harm exists because of the deception of the letter. Now, if she had paid for whatever reason, that defense goes away by operation of law. So I think it is connected. Regardless of what motivated her, that was a real risk of losing that defense. But she said she wasn't going to pay. She had no intention of paying. Well, she was... She understood that she couldn't be sued. Because that's what the letter says. And she knew that independently. Well, she was also under the false impression that she didn't owe the debt because she thought it went away when Midland funding, when it previously sued her, dismissed the case. So that false notion by an unsophisticated consumer is meaningless. That's not a consequence of this letter or the language in this letter. Her misunderstanding about whether the debt was extinguished or not by virtue of prior litigation is not an attack on the contents of this letter. No, the contents of this letter called into question her resolute belief that she did not owe it. That was caused solely by this letter. But that is totally... She has heard from them. ...unsafe for the claim they're making here. Well, I guess you and I read our complaint differently, our second-hand complaint differently. You're not suing because the letter implied the existence of a debt that she did not owe. You're suing because the letter contained language about the time-barred nature of the not to report to credit agencies without advising her of the potential consequences of reviving it if she made a partial payment. I think that's what I understand your... It's multifaceted, but yes, that's part of it. The revival issue is, in fact, part of it. And regardless... Well, that's the heart of the claim that you're asserting on behalf of the class. That's the heart of the claim that the district court will grant its summary judgment on. Right. And this is basically building on what the court said in the Pantoja case. And so that's, I think, that's the... To use your term at the outset, that's the framework for understanding the merits of this claim. So understanding it in that way, you have to connect to... Well, concrete injury. And when your plaintiff says, I was completely unaffected other than I called my attorney because I thought this had all gone away. That's unrelated to the nature of the claim that you're making. Well, I think that's... And a call to an attorney can't constitute a concrete injury. In fact, otherwise, there's no teeth in the Article III standing requirement. I understand that. I was just giving you her mindset when she had called me. But I think that dismisses what Ms. Pierre actually did in responding to the letter. And that is disputed on many, many grounds. Unlike the plaintiff in Casillas, who did nothing. She was completely apathetic. She sat back, had no impact, had no intention, regardless of what the letter said, of doing anything differently. Whereas Ms. Pierre was conflicted about what would happen if she didn't respond to this letter by the due dates three times imposed on her in that letter. And it also doesn't overcome the second aspect of Pantoja where it said, didn't say that they could not sue her. So I think that she, if it rests... I don't think Casillas said that it rests on the conduct of a plaintiff if it is a deceptive letter, as opposed to a mere procedural defect. But nothing in rationale or reasoning of the Casillas decision makes it inapplicable to claims under 1692 ENF for misleading and or unconscionable debt collection practices. And that is confirmed by the Tholes decision, which granted is not FDCPA, it's ERISA, but it does stand for the proposition that there must be an injury, in fact, injury, in fact, even when the claim statutory violation is substantive rather than procedural. Well, but the holdings of this court and just this summer were that there also is a there's standing if it's, if there is a risk. Yeah, that's just right out of Spokane. But you have to demonstrate that there was a risk that she was going to do something differently based on a challenged, misleading statements in this letter or the challenged statements that you contend are misleading, building on a decision. The problem arises is that there was no language in this letter on this issue. There was no mention of. And I understand the nature of your claim. But what is, what, what was the risk that appreciable risk? That's the language from Spokane, that she would have done something differently, altered her course of conduct in some way that created an injury. In fact, when she testified to the contrary, that she would have done nothing differently. She would have taken the same action regardless of these couple of sentences in the letter that you contend were misleading. Well, there may be some plaintiff out there on the rationale of Patoya who has a credible claim of actual injury, in fact, because he or she was misled and did or would have or could testify to an appreciable risk of altering course of conduct. But it seems to me this plaintiff isn't that person. Well, her testimony, she's almost testified herself out of having standing. Well, if she had if she had no concerns whatsoever and took such a hard line approach, I don't know why she would have called and disputed it or or or called an attorney, frankly, but called and disputed on many, many grounds her concerns about being sued again. And that raises the risk of revival. So she did take those actions. She didn't pay them. That's true. But unless this court changes its precedent, then actual damages are not are not required. So question about whether the claim is for actual damages or statutory damages. It's a question about what is the concrete injury, in fact. OK, well, I'm not sure I'm going to convince you, but I think the risk of concrete injury is if a if a pain gets in response to this deceptive on many levels letter that the defense would go away. And I think that risk existed here for Ms. Pierre, as I as evidenced by her concern about whether whether she needed to make that payment, which she did testify to. OK, and moving off of the standing question, can you shed some light on what the district judge did on this class claim for actual damages and then the opt out ruling? And I was really confused. That seemed to be something of a moving target. It certainly was for me as well. So on the morning of the trial, on the eve of trial, the judge decided to redefine the class and redefined it to not allow actual damages. So we it wasn't a matter of preserving something at trial. We weren't that wasn't even part of the case anymore. Now, prior to that, the we had moved at some point to send a signal in our auditorium and ask, all right, what did you pay? And I'm not sure that's relevant necessarily to get somebody's motive. But, you know, we can collect evidence and figure out how we use that later down the road. And the judge denied it and said, no, they can they can just get out of the class. All right, so immediately we filed a motion to give them the opportunity, given notice, given the opportunity to opt out if they have may have an actual damages claim, which the judge then denied as well. And on the eve of trial, he acknowledged that was error. But nonetheless, allowed the case to go forward only on statutory damages without giving those class members the chance to exclude themselves without allowing any actual damages case to proceed without notice. So in this case, Midland gets away with collecting more than a million dollars from these class members and faced a judgment of three hundred fifty thousand. It's a pretty good investment. Were those claims extinguished by virtue of this judgment or did the judge's redefinition of the class exclude anybody with a claim for actual damages? He didn't exclude those class members with potential claims. He simply redefined it. All of those class members are still members of the class because they also have statutory damages claims. So I think that does exclude them because it's a final judgment on the Barrett's just limited statutory damages. OK, Mark, I ask you about this dispute that you and the defendants are having about count two and whether it was a judgment or a settlement. Yes. What are the stakes of that from your perspective? And Mr. Brody, I hope you'll be able to answer that question rebuttal as well. Well, the stakes look from a perfectly blunt standpoint are probably related to a petition because the characterization of whether it is a settlement versus I'll ask Mr. Brody about it. Thanks. OK. All right. I see I'm relatively out of time, so I will be able to get to the rest of it. But I thank you for your time. Thank you very much, Mr. Brody. Mr. Brody, you're still muted. OK. Thank you, Judge. First, Judge Hamilton's question. There are no stakes to count to. Maybe there's an issue about attorneys fees, but Midland took the position in the trial court that they would not assert the settlement versus judgment issue as a grounds to allow or not allow attorneys fees. So there are no stakes on the issue of the redefinition, the so-called redefinition of the class. This was raised in the fourth brief for the first time, and we think that's too late. The class was never redefined. Docket entry 199 starts by saying, motion hearing and status held for reasons stated on the record. Defendants are motion to decertify is denied in full. The class was never redefined. What happened is the class consisting of everyone who received this letter, some of whom had statutory damage claims, some of whom might have had actual damage claims, went to trial, and there was no evidence presented at trial of act sufficient to prove actual damages. There was no evidence of causation and damage. So the plaintiffs lost their actual damage claim. Not that it was redefined away from them. I thought the plaintiff wasn't allowed to prove up actual damages. I thought this claim was tried only on statutory damages. There was, because there was a motion in limine decided by the court beforehand as to whether they had presented sufficient evidence to go to the jury on that, and the courts said no, and then no offer of proof was made to complete the factual showing. So that issue was resolved, pretrial and evidentiary issues, and then resolved at trial. Well, do we have a problem then? Because the actual damage claim holders needed to be given an opportunity to opt out. Their claims weren't going to be tried because. They were given an opportunity to opt out, Your Honor. When the notice was sent to the class after the class was certified, the class was told that a class had been certified, including both claims for actual and statutory damages. It's just the plaintiffs failed to prove their actual damages. So that's our position. Thank you for indulging me with the extra time. We request that the matter be reversed. All right. Thank you very much. Our thanks to both counsel and the cases taken under advice.